UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
IN RE:                      .    Case No. 10-11727-REG
                            .
PALI HOLDINGS, INC.,        .
                            .
          Debtor.           .
. . . . . . . . . . . . . ..
BRADLEY REIFLER and         .    Adv. No. 11-01682-REG
DAVID WASITOWSKI,           .
                            .
          Plaintiffs,       .
     v.                     .
                            .
CERTAIN UNDERWRITERS AT     .
LLOYD'S, LONDON,            .
                            .
          Defendants.       .
. . . . . . . . . . . . . ..
PALI HOLDINGS, INC.,        .    Adv. No. 10-03533-REG
                            .
          Plaintiff,        .
     v.                     .    One Bowling Green
                            .    New York City, NY 10004
LLOYDS OF LONDON,           .
                            .
          Defendants.       .    September 20, 2012
. . . . . . . . . . . . ..        12:25 p.m.
```

TRANSCRIPT OF DISCOVERY DISPUTE AND STATUS CONFERENCE
BEFORE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY COURT JUDGE


Audio Operator:            Jeanelle

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311   Fax No.  (609)587-3599**

APPEARANCES:

| | |
|---|---|
| For Plaintiffs<br>Bradley Reifler and<br>David Wasitowski: | Law Office of Gregory L. Smith<br>By:  GREGORY L. SMITH, ESQ.<br>147 Prince Street, Floor 2<br>Brooklyn, NY 11201 |
| | Summers & Schneider<br>By:  DOUGLAS SCHNEIDER, ESQ.<br>147 Prince Street<br>Brooklyn, NY 11201 |
| For Defendant Certain<br>Underwriters at<br>Lloyd's, London: | Coulter & Walsh<br>By:  PHILIP J. WALSH, ESQ.<br>     JOHN V. COULTER, ESQ.<br>675 Third Avenue, Suite 1805<br>New York, NY 10017 |
| For the Chapter 7<br>Trustee of Pali Capital<br>and Pali Holdings, Inc.: | Fox Rothschild LLP<br>By:  ERIN ZAVALKOFF-BABEJ, ESQ.<br>100 Park Avenue, Suite 1500<br>New York, NY 10017 |

- - -

3

1          THE COURT:  All right.  Going on to Pali Holdings.

2    Let me get appearances and then I'd like everybody to sit down.

3          MR. SMITH:  Good morning, Your Honor.  This is

4    Gregory Smith for plaintiffs Bradley Reifler and David

5    Wasitowski.  I'm joined by my colleague Douglas Schneider to my

6    left.

7          THE COURT:  All right.  That's Mr. Smith and your

8    colleague's name is Ms. Schneider -- or your name is Schneider.

9          MR. SMITH:  Mr. Schneider, yeah.

10          MR. SCHNEIDER:  S-c-h-n-e-i-d-e-r.

11          THE COURT:  All right.  Thank you, Mr. Schneider.

12          MR. SCHNEIDER:  Thank you, Your Honor.

13          MS. ZAVALKOFF-BABEJ:  Good morning, your Honor.  Erin

14    Zavalkoff-Babej representing the Chapter 7 Trustee of Pali

15    Capital and Pali Holdings.

16          THE COURT:  Forgive me, your last name again?

17          MS. ZAVALKOFF-BABEJ:  Zavalkoff.

18          THE COURT:  Zavalkoff.  Okay.  Okay.

19          MR. WALSH:  Philip Walsh for the defendants and my

20    colleague and partner John Coulter.

21          THE COURT:  All right.  Mr. Walsh, you used the words

22    defendants, I assume you're the Lloyd's Underwriters?

23          MR. WALSH:  Yes.

24          THE COURT:  Okay.  All right.  Folks, I have reviewed

25    the various letters, and it appeared principally from Mr.

4

1  Walsh's letter which was in the middle of the sandwich that

2  some of the issues are moot, maybe many of them are moot.  My

3  view, again my tentative California style, is that requiring

4  somebody to put up a 30(b)(6) witness when the witness wouldn't

5  know anything is stupid and is a waste of everybody's time and

6  I would be disinclined to order that.  It looked like the

7  documents in the privileged list have either been wholly or

8  substantially now provided.

9          So, Mr. Smith, I know you were looking for relief.  I

10  need you to tell me what's still on the table and then I'll

11  hear first from you and then Mr. Walsh and let's see what's

12  still up in controversy.

13          MR. SMITH:  Well, I'm very confused by what Your

14  Honor has concluded from the correspondence.  I know of nothing

15  that's mooted.  I know that Mr. Walsh has made the contention

16  that there's nobody at the managing agent for the lead

17  underwriting syndicate who has direct personal knowledge.

18          THE COURT:  Then nobody at the syndicate can testify

19  to claim any facts that you may want to prove and they may have

20  a harder time refuting you, but how could you make knowledge

21  come out of the air?

22          MR. SMITH:  They have a claims file which has

23  significant documents in it.  They --

24          THE COURT:  I thought their claims file was produced.

25          MR. SMITH:  It was not produced.  I do not have a

1   claims file.  I've never been produced a claims file.  What

2   I've been produced is correspondence between Pali Holdings or

3   representatives of Pali Holdings and Illinois counsel, coverage

4   counsel, who did the claims investigation, but what I don't

5   have is, for instance, any documents between coverage counsel

6   in Illinois and the Underwriters in London, not giving legal

7   advice, but documenting the investigation, the facts that were

8   learned, the requests that were made to the insureds that

9   allegedly were not fulfilled.

10          I mean one of the things that Underwriters has done

11  here is that they've thrown a bunch of non-coverage affirmative

12  defenses on the wall to see what will stick, one of them is a

13  breach of the cooperation clause and there are several subparts

14  related to that defense, one that the person seeking coverage

15  here, as well as Pali, deprived the Underwriters of the ability

16  to mount a defense because they retained their own counsel.

17  They did so of course.  What they don't say is that they

18  retained this counsel with the blessing and consent of the

19  coverage counsel in Illinois.

20          But one of the other things they state as a breach of

21  the cooperation clause is that Pali did not provide information

22  that was requested.  The -- if they're going to make that

23  defense I'm entitled to depose somebody who can give me the

24  facts underlying that defense.  And so --

25          THE COURT:  Now, Roberts is available as a third

6

1   party witness or would at least seemingly be available as such,

2   right?   James Roberts?

3           MR. SMITH:  He's no longer employed, but --

4           THE COURT:  Big deal.  Why does that matter?

5           MR. SMITH:  It doesn't matter to me.  That's --

6   30(b)(6) says you can designate anybody, you can hire a third

7   party.  So that's why --

8           THE COURT:  Well -- look, all of us have been

9   litigators at one time or another.  I was a litigator for 30

10  years before I started this job.  In most cases 30(b)(6) is a

11  quick, clean procedure because there's somebody still at the

12  opponent who knows something about what's going on.

13          MR. SMITH:  Your --

14          THE COURT:  But there are cases when the 30(b)(6)

15  witness would either have to educate himself or herself or even

16  that would be useless.  Now, I've never been a fan of the

17  30(b)(6) witness educating himself or herself, but if parties

18  are happy with that that's fine, but the best evidence is by

19  the people who know what happened, and if there is nobody on

20  behalf of the syndicate who has first-hand knowledge, well Mr.

21  Walsh may have deal with that down the road, but he can't make

22  a witness with knowledge materialize out of thin air.

23          MR. SMITH:  Well, I submit, Your Honor, that that's

24  exactly what's going to happen here.  That Mr. Walsh will put

25  somebody up, either it will be coverage counsel from Illinois

1   or it will be someone he educates at Brit because he does have

2   the materials to educate a witness, he just hasn't done it and

3   that person --

4           THE COURT:  Wouldn't that at least seemingly be

5   whatever that witness said be hearsay?

6           MR. SMITH:  Potentially.  Potentially, but not if

7   it's not if Mr. Hanson (phonetic), the coverage counsel from

8   Illinois, who refused to sit for his deposition.  I expect that

9   there will be an affidavit presented from Mr. -- signed by Mr.

10  Hanson which will attempt to introduce all the facts underlying

11  their defense based on lack of cooperation, based on breach of

12  the warranty clause.  There's a contention that the CEO of Pali

13  when he signed the application for insurance knew a whole bunch

14  of things that weren't disclosed.

15          They -- Your Honor, 30(b)(6), now I maybe naive about

16  this, but the case law says if you don't have somebody with

17  personal knowledge at the organization it's not optional.  You

18  have to educate someone and if you have the documents to do it,

19  if you have -- if outside counsel has knowledge then that's

20  where you get it from.  You have to -- the witness, whoever you

21  designate, has to sit down, review binders, review the relevant

22  documents.  If there's anybody in the institution that does

23  have personal knowledge about this or that aspect you interview

24  them and you learn what -- but --

25          THE COURT:  And do any of those cases say that the

1  Court should order that even when it would be a useless

2  exercise?

3          MR. SMITH:  I -- but how have we established that

4  that would be --

5          THE COURT:  The underlying documents producibility

6  that would be reviewed by such a 30(b)(6) witness is a very

7  separate issue.  That goes to relevance.  It goes to

8  attorney/client privilege to the extent there is any such, and

9  it goes to work product and attorney mental impressions to the

10 extent those are discoverable or discoverable under

11 extraordinary circumstances, but --

12         MR. SMITH:  Well --

13         THE COURT:  -- you're telling me that I have to

14 direct your opponent to educate a witness when the witness

15 knows nothing and to order it.  If you have a case that tells

16 me that, I would like to read it because I've been doing this

17 for 42 years and I've never seen it.

18         MR. SMITH:  Mr. Schneider will address that.

19         MR. SCHNEIDER:  Your Honor, if I might the -- Brit

20 Insurance has asserted defenses in the case.  If they have

21 nobody to assert those defenses then the defenses should be

22 struck.  If you assert defenses that require a factual basis

23 then if you don't -- who is that filed the answer in this --

24         THE COURT: Forgive me, Mr. Schneider, the rule of

25 law is not what you stated, is that affirmative defenses must

1  be proven.  They must be proven by one means or another.

2          MR. SCHNEIDER:  But you need a good faith basis to

3  assert them, Your Honor.

4          THE COURT:  Forgive me, you don't argue with me.

5          MR. SCHNEIDER:  I apologize.

6          THE COURT:  Yes, and if the good faith basis is not

7  apparent from other evidence in the case we can deal with that

8  at an appropriate time, but there are an array of mechanisms by

9  which facts may be proven.  They may be proven by documents.

10  They may be proven by third party witnesses.  They may be

11  proven by taking an opponent on adverse direct.  I have ruled

12  on this issue or if I haven't made it clear that I've ruled on

13  this issue I'm making it clear now.  Let's move onto the areas

14  where you guys have stronger points.

15          MR. SMITH:  Well, Your Honor asked for case citations

16  related to 30(b)(6) deponent's obligation to educate a witness

17  who had no prior knowledge.  I can give you two right now, QBE

18  Insurance Corp. v. Jorda Enterprises which is cited in all the

19  treatises as one of the most succinct and authoritative

20  descriptions of a 30(b)(6) deponent's obligations to designate

21  a witness and educate that witness in order to testify on

22  behalf of the organization.  I mean the purpose of the rule was

23  to prevent bandying so that defense counsel --

24          THE COURT:  To prevent what?

25          MR. SMITH:  What is called bandying, where you bandy

1 the plaintiff's attorney or the attorney trying to take a

2 deposition from one person to another who disclaims personal

3 knowledge about this or that fact in dispute and then you have

4 to notice somebody else's deposition and guess -- try to guess

5 who within the organization would have personal knowledge of

6 that.   30(b)(6) is an attempt to stop that practice and --

7          THE COURT:  Well, I understand that, but if the

8 lawyer on the other side steps up to the plate and says I don't

9 have anybody I don't see how anybody is being bandied, is that

10 the word?

11          MR. SMITH:  Bandied, to bandy someone from one person

12 to another.  It's called bandying.  That's what it's referred

13 to in the treatises and the case.  That citation is 277 F.R.D.

14 676.  It's a Southern District of Florida case.  There's

15 another Great American Insurance Company of New York v. Vegas

16 Construction Company 251 F.R.D. 534.  Your Honor, if you were

17 to open Wright and Miller or Moore's Federal Practice on

18 30(b)(6) it would tell you exactly the same thing.

19          Yes, they do have an obligation to -- if they have

20 the ability -- I'm not asking them to designate a witness to

21 testify about the Mars Rover.  What I'm asking them to do is to

22 designate a witness who is going to be able to tell me what

23 they contend the facts are that underlie their affirmative

24 defenses.  And they, as Mr. Schneider said, presumably at one

25 point they knew these facts because they had to have a good

1  faith basis to plead these affirmative defenses, and they have

2  slightly answered interrogatories by referring to certain

3  documents where we can go looking for these facts, they say.

4        So they do have through the documents in their

5  possession, through interviewing their coverage counsel in

6  Illinois, et cetera, et cetera, they do have the ability to

7  marshal these facts, designate one or more witnesses, educate

8  those people and let me figure out what the organizational

9  contentions are.

10       Mr. Walsh made the very generous offer that I could

11 use Hague Convention procedures to go chasing people who used

12 to work there who he didn't know where they were and so -- but

13 that's exactly the sort of thing that 30(b)(6) is designed to

14 protect against.  It's not -- I really don't care who

15 testifies.  I'm not concerned about the person who has personal

16 knowledge.  What I'm concerned about is what does -- what are

17 the organization's contentions in this litigation related to

18 the facts underlying their affirmative defenses, the

19 contentions they make about the most basic interpretations of

20 the policy here.  I couldn't get them to answer those

21 questions.

22       They -- neither one of their witnesses for the lead

23 underwriter or the following underwriter would tell me what

24 they consider the claim as defined in the policy to be here.

25 How can I prepare a defense when in the first instance the guy

1   says I have no idea because I've never reviewed any document

2   related to this case and the second guys wouldn't -- Mr. Walsh

3   wouldn't allow him to answer because he said that's

4   attorney/client privilege?  How can I prepare a defense when I

5   don't even know what they think the claim in -- for coverage

6   under this policy is?

7           And the policy defines a claim either as a lawsuit or

8   a written demand for damages, a written demand for relief made

9   against an insured.  So it does not have to be a lawsuit, and

10  we have -- in the history of this litigation we have written

11  demands for relief made against my clients.  So -- and I can't

12  get the Underwriters to take a position as to what they

13  consider the claim under their own policy to be.  So I don't

14  see how I can prepare a defense for trial when I have to guess

15  as to what their position is going to be.

16          Now, I do have a recommendation for getting this all

17  off the table and let's go trial.  If they want to withdraw --

18  they've basically admitted, at least for strategic purposes for

19  today's conference, that they have no way of coming up with

20  this knowledge to educate a witness to sit for a 30(b)(6)

21  deposition.  Okay.  Well, then withdraw the defense, don't put

22  any evidence in support of those affirmative defenses and let's

23  just argue about coverage which is what we should have been

24  doing from the very beginning.

25          Let's -- what this case I believe will come down to

1   is does the insured versus insured exclusion eliminate coverage

2   for my client's claims, and does the allocation clause at least

3   bring back coverage to the extent that some of the claimants

4   were not insured under the policy, so that some of claims were

5   asserted by non-insureds against insureds?  Admittedly there

6   were claims asserted by insureds against insureds.

7          What I think the case will come down to and what Your

8   Honor will be asked to decide is a pure question of law.  How

9   do you interpret the insured versus insured exclusion and does

10  the allocation clause -- if the exclusion applies does the

11  allocation clause give back some proportion of coverage?  I

12  think that's at the end of the day what this case will revolve

13  around.

14         So if they don't have any way to educate a witness to

15  sit for a 30(b)(6) deposition to testify about facts related to

16  their claim that there was a breach of the warranty clause, to

17  testify about the facts to underlie their defense that there

18  was a breach of the cooperation clause then withdraw those

19  defenses and let's get to coverage, and I don't need to depose

20  anybody at that point, but the only reason I'm asking to depose

21  the entity, the managing agent which was in charge of the

22  claims handling, is if anybody knows they do.  They hired

23  counsel in Illinois to conduct a claims investigation.  They

24  won't let him sit for a deposition.  They won't produce any of

25  his documents related to -- let him produce any of his

1  documents related to the claims investigation.  I have no way

2  of preparing for those defenses.  They're --

3          THE COURT:  You're getting very, very repetitious,

4  Mr. Smith.

5          MR. SMITH:  I understand.

6          THE COURT:  Move onto your next point.

7          MR. SMITH:  The -- well, I mean the other points are

8  minor in comparison.  I mean -- and they turn somewhat on

9  whether Your Honor is going to take a position or not about

10  whether they can actually put up witnesses at this point to

11  testify in favor of these -- in support of these affirmative

12  defenses.  If they can what I would like to do is, either today

13  or get permission from Your Honor to make a motion, to

14  demonstrate that the legal authority is extremely clear.

15          When an insurance company hires counsel to conduct a

16  claims investigation, two things flow from that.  Any documents

17  that that counsel generates prior to the insurance company

18  making a determination that there is no coverage and

19  communicating that no coverage declamation to the insured

20  cannot be claimed as work product because before the insured

21  denies coverage there is no dispute that could reasonably lead

22  to litigation.  That's true both in New York and it's true both

23  in Illinois where Underwriter's coverage counsel is based.

24          The other very clear proposition from the

25  authorities, both in New York and Illinois, is that any

1  documents, any correspondence between the coverage counsel

2  who's doing the claims investigation and the insurance company,

3  is not protected by the attorney/client privilege unless the

4  coverage counsel is providing legal advice to the insurance

5  company about what it should do, what position it should take,

6  but communications that -- from counsel to the insurance

7  company that are reporting the facts that the counsel has

8  learned, the steps that the counsel has taken to figure out --

9  to request information from the insured, to document

10 information received from the insured, all of that is not

11 covered by the attorney/client privilege because the lawyer is

12 acting in the same capacity as an in-house claims adjustor

13 would be acting for an insurance company and you can discover

14 those communications in-house when they're performed by an

15 employee of the insurance company.  And the Courts have taken

16 the position that you don't exempt yourself from that sort of

17 discovery simply by virtue of hiring a lawyer to handle claims

18 investigation.

19         And there are tons of documents on the newly revised

20 privilege log that we received on -- late on September 18th

21 that now list documents that were listed originally on the

22 privilege logs produced by Illinois counsel.  And so what I

23 would like to do is figure out someway -- if again we're going

24 to be litigating issues concerning what happened during the

25 claims investigation process what I would like to do is figure

1  out someway to get a ruling from the Court and even if involves

2  an in camera inspection of documents listed on the privilege

3  log whether there are documents there that simply document

4  counsel's claims investigation and either don't relate to or

5  can be redacted to remove legal advice that may also be

6  contained in those communications.

7          And there are about a dozen documents, even more,

8  that have been withheld on the basis of the work product

9  doctrine which were generated prior to November 25th, 2008,

10 which is the date that the insurance company communicated no

11 coverage to Pali.  So the -- there's a bright line in the cases

12 that says no work product protection at all, not even arguable,

13 for documents generated prior to communication of the insurer's

14 decision to deny coverage, and they're still withholding them,

15 both counsel in Illinois and Mr. Walsh, and refused to produce

16 them.  I -- you know, I've provided case authority on that.

17 I've never received any argument back that suggests that

18 authority is not applicable, that I'm misinterpreting it, no

19 citation of contrary authority.  It's just been ignored.

20         So, you know, I -- again, I think what will happen is

21 that Your Honor will be presented with an affidavit signed by

22 Mr. Hanson, coverage counsel in Illinois, and if that's going

23 to happen I think the rules entitle me to not only depose him,

24 but to get a document production from him that is consistent

25 with the obligations, discovery and disclosure obligations, as

1 interpreted under the Federal Rules of Civil Procedure.  The --

2 Doug, do we have any other issues?

3         MR. SCHNEIDER:  (No audible response).

4         MR. SMITH:  Mr. Walsh served responses to our request

5 for admit -- the request to admit were served on May 22nd.  I

6 pointed out their failure to respond within 30 days in my

7 letter of September 13th.  Those responses were first -- first

8 reached me in late September 18th attached to Mr. Walsh's

9 letter.  They offer no explanation for why they didn't respond

10 within 30 days.  I think it's pretty much automatic that the

11 request for admissions should be deemed admitted in their

12 entirety.  Anything else, Doug?

13         MR. SCHNEIDER:  (No audible response).

14         THE COURT:  All right.  Mr. Walsh?

15         MR. WALSH:  There's no motion made in terms of the

16 request for admission, but they were -- we responded to them

17 and we admitted 80 percent of them.

18         THE COURT:  Why didn't you respond on time?

19         MR. WALSH:  Well, because we didn't, Your Honor, and

20 we apologize for that and I'll tell you this case -- first of

21 all, I want to say, you used the word fragging twice.  That

22 does take me back 40 years, and so I'm going to ask that -- and

23 I wrote this down when you said that, we get a direction from

24 the Court that counsel cease and desist from writing

25 vituperative incandescent letters to the Court.  So with --

1        THE COURT:  Well, frankly, Mr. Walsh, both sides are

2 getting me a little, I won't use the original word I was going

3 to use, annoyed.  Deadlines exist for a purpose.  If you can't

4 meet your deadline you call up your opponent and you ask for

5 extra time.  I've never been a fan for request for admission,

6 but you can't just ignore them.

7        MR. WALSH:  No, no, I understand that, Your Honor,

8 and I tell you we apologize for that and he's got them, and if

9 there's anything I can do to make it better -- I mean I didn't

10 resist it.  When I did respond to them they responded in the

11 fashion that they ought to be, namely, I admitted -- I think

12 there's 15, I admitted 13.  So I mean, you know, if they're

13 deemed admitted they're admitted, but, you know, I'm not hiding

14 anything.

15        And in terms of -- the other thing I want to add

16 before I make a brief commentary because I don't think I need a

17 lot is the trustee's counsel which has far more financial stake

18 in the result of this case has not once joined in the

19 activities of the counsel for Reifler and Wasitowski who are

20 chasing their legal fees.  There's far more financially at

21 stake by the trustee.  She has not -- they have not -- Fox

22 Rothschild has not joined in at all and that speaks volumes as

23 far as I'm concerned.

24        Now, in terms of the case itself I've been litigating

25 for 35 years over that, insurance coverage.  This case involves

1  the underlying pleadings, the litigation, the motions, the

2  depositions that were taken in the underlying.  It's not like a

3  fact investigation where you go out and you have some kind of a

4  fidelity bond claim where you look at the facts and

5  circumstances.  It's all there in the pleadings, it's there,

6  and you apply the policy wording to those underlying issues.

7  Then you also look at the cooperation and the other issues, but

8  that's developed.  Once it's there it's there and you apply the

9  applicable law.

10          Now, from a practical standpoint the internal e-mails

11  between James Roberts who was the lead on this from day one and

12  who left -- and I told in my answers to the interrogatories, my

13  responses, I said he's no longer there.  He was involved, and

14  the question in the interrogatories was very specific.  They

15  want to know the names of those individuals who materially

16  participated in the making of the decision to deny coverage.

17  That was a specific request in the interrogatories.  I

18  responded.  I said, James Roberts, Jamie Fleming, Keith Hanson

19  in Chicago and Tordie (phonetic), the latter two are lawyers.

20          I also said in my answers to the interrogatories that

21  Roberts was no longer there.  He hasn't been in Brit in a year.

22  I revised my -- in the interim between my revision of the

23  answers to the interrogatories and the initial service of the

24  answers to the interrogatories, I had a telephone call with

25  counsel and I did say over the phone where James Roberts was

1   and I said it was Barbican Insurance Company in London, and

2   then I said several times, look at, use the Hague Convention,

3   you know, he's there.  He's not going anywhere.

4        THE COURT:  You don't need the Hague Convention for

5   taking a deposition in the U.K., do you?

6        MR. WALSH:  I think -- I'm not sure, Judge, because I

7   never did it.  I mean I never did a third party witness, but he

8   was there.  He could have -- I mean counsel could have looked

9   into it.  All of the documents, all of the e-mails which I've

10  identified, and I'll get to that, all have James Roberts' name

11  on them.

12        I then followed up in my responses, my revisions,

13  saying Debra Allan was now handling this claim.  She was a

14  senior claims examiner, the same as Roberts before he left.  I

15  also said in my answers to interrogatories that the only thing

16  she knows about this file is from the lawyers.  So most or if

17  not -- most I think I said, most of her testimony will be

18  privileged.  Nothing happened.

19        There was -- you know, and then we decided on

20  depositions.  Deposition of Fleming was going to be on the

21  16th, Allan was on the 15th, Wednesday.  On that Wednesday

22  before they called me from Brit and said she'd left the company

23  and there was no one there except for David Gillis who was her

24  -- sitting next to her I suppose, I mean not physically, but in

25  terms of seniority and that he was on vacation, but he would

1  step up.  I immediately advised counsel that there was a change

2  and David Gillis would be the witness.

3          I met David Gillis on Tuesday before the deposition

4  for a couple hours and I met him on Wednesday morning because

5  the deposition started at one.  All he -- the only information

6  he got, whether he's a 30(b)(6) or otherwise -- first of all,

7  he wasn't -- he had no material participation in the making of

8  the decision to deny coverage and, secondly, he learned it from

9  me.

10         Now, it's all I can -- and I told -- and you'll see

11 on my letter I said during the deposition or when it started

12 that, look at, there's no way on earth that we can produce

13 anybody that knows the facts in this case and I mean, you know,

14 I told --

15         THE COURT:  How are you going to prove your

16 affirmative defenses --

17         MR. WALSH:  I'll show you how.

18         THE COURT:  -- Mr. Walsh?

19         MR. WALSH:  It's simple.  We prove it from the

20 conduct of the plaintiffs.  That's how we do it.  There are

21 letters from the insurance lawyers to -- which I've produced

22 obviously, to the -- both the trustee's lawyers --

23         THE COURT:  Insurance lawyers for whom?

24         MR. WALSH:  For the Underwriters, the coverage

25 lawyers, where they denied the claim.  There was -- there's --

1   there must be three inches, two inches, three inches of

2   documents, correspondence going back and forth from the lawyers

3   to the representatives and lawyers of Pali and Reifler and

4   Wasitowski.  They're there.  They were taking a position --

5   they were telling them, that is to say the plaintiffs, in 2008

6   the deficiencies.  They were telling them that.  And how did

7   they know it?  From what they -- from the documents.  There's

8   no -- what he said, you're hiding the ball, there's no hidden

9   ball here.

10          As a matter of fact the -- all of the -- and to be as

11  candid as I can with the Court, all of the 11 letters that went

12  from the Hanson firm and then one from Tordie and the

13  litigation was ongoing, all involve legal recommendations based

14  upon the law because they had the underlying litigation.  They

15  had I assume access to the depositions given.  They had the

16  motions.  They had the affidavit of Helen Mogul (phonetic) on

17  the one hand and Thomas Morland (phonetic) on another where

18  they were talking about this internecine warfare.  And, indeed,

19  what I did is in my answers to the interrogatories when they

20  asked me on what basis do you deny the claim or on what -- I

21  recited everything.  Nothing is going to change, it's that.

22          And I'm quite happy if the Court wants to, is to give

23  these documents to any third party and say you give Mr. Smith

24  those portions of the 11 reports which you reckon and deem not

25  to be privileged.  I mean the whole thing is privileged.  It's

1   legal issues with recommendations.

2       THE COURT:  There's a distinction, as Mr. Smith

3   pointed out and in this respect I was inclined to agree with

4   him, between providing legal advice based upon your legal

5   analysis and a lawyer going out as an investigator and

6   gathering up facts from the outside world and relaying them to

7   its colleague.

8       MR. WALSH:  That's why I wanted to distinguish that

9   as you've just articulated it to what we've got here.  This is

10  not a situation where you've got a fidelity bond claim with a

11  bank where the lawyer goes out and investigates all of the

12  various intricacies that caused the defalcation and then writes

13  an opinion to the client.  These -- the opinions that were --

14  the opinions that these lawyers wrote, I've read them, all have

15  to do with the underlying litigation and the documents.  As a

16  matter of fact all of the documents produced to me both by --

17  literally 99 percent by both the trustee and Mr. Smith are the

18  underlying pleadings and that's what we have.  That's what I've

19  produced.

20      Now, he wanted me to go back further.  When we came

21  back from the depositions we came back on -- they were done on

22  the 17th, I came back to New York.  On Monday I got an e-mail

23  from Mr. Smith saying he demanded a privilege log, and I wrote

24  back, I said, well, you never gave us one.  So, you know, we

25  bandied this back and forth for about -- and then -- oh, and

1  then we Reifler and Wasitowski's depositions.  So on Friday

2  night, the 24th, I get five pages -- five documents identified

3  as a privilege log.  Well, then I did my homework.  I wrote and

4  identified, and with specificity, the length the document, the

5  date and the subject matter of each one of the 11 reports sent

6  to the Underwriters.  That wasn't good enough.  He wanted more.

7  He said, you know, you're -- Jamie Fleming said that there were

8  e-mails going back and forth, I want all those.

9         So this past week I've gone over all of the documents

10 that I have at all, and there are covering e-mails from Joanne

11 Fercano (phonetic), who is an associate attorney at Hanson's

12 firm, attaching their reports, back and forth communications,

13 so and so is on holiday, sorry, but he -- you know, he agrees.

14 I identified all that for the sake of good order.

15        And when the Court hears that we didn't produce the

16 claims file, of course we did.  I produced everything that was

17 given to me that the lawyers had in Chicago.  I didn't produce

18 their work product.  I didn't produce their legal analysis.  I

19 didn't produce their recommendations.

20        THE COURT:  There are three separate things here, Mr.

21 Walsh, and we can't blend them together.  The first is the

22 legal advice that a client -- that a lawyer provides to his

23 client or in certain instances what a client provides to the

24 lawyer for the purpose of providing legal advice.

25        MR. WALSH:  Right.

1             THE COURT:  But here you have the attorney's side

2    doing the investigation.  Then there are attorney mental

3    impressions which are normally privileged under all

4    circumstances, technically not privileged, but protected.

5    Third, there is work product which are facts that the attorney

6    or an agent of an attorney gathers up which can be produced

7    under an appropriate showing of need.

8             MR. WALSH:  Right.

9             THE COURT:  And with -- especially with Roberts being

10   difficult to reach you're exposed especially on the third.

11   Now, isn't your opponent entitled to get production of your

12   work product or at least scrutiny by a judge after the

13   determining that there is no suitable alternative way for your

14   opponent to get that stuff?

15            MR. WALSH:  First of all, I have no problem with

16   producing any of this to the Court and let them make up their

17   own mind.  That's -- I'm happy with that.  These letters are

18   not fact investigations.  They're a recitation of the

19   underlying pleadings which is what I got which is what the

20   trustee gave me which is what my clients had and which is what

21   the lawyers had.  I mean I did a little bit more.  I've gone

22   through discovery in this case.  They didn't do that, but I've

23   done it.  I have no problem -- I'm not hiding a thing.  If the

24   Court wants to see all 11 reports with recommendations and all

25   of the communications I just think it's a waste of time.

1          Now, in terms of the documents that they relied upon,

2   it was the pleadings.  And he was absolutely right, you know,

3   this is going to probably come down to -- it's nuance, but it's

4   insured versus insured and it's --

5          THE COURT:  But you're making an additional claim.

6   Forgive me, Mr. Walsh, but you're making an additional claim

7   that your guys were defrauded into providing coverage or

8   continuing coverage.

9          MR. WALSH:  That --

10         THE COURT:  And putting aside the means by which that

11  information should be conveyed --

12         MR. WALSH:  Right.

13         THE COURT:  -- would you agree that you've got to let

14  Mr. Smith know the ways by which you're contending that your

15  client was sucked in?

16         MR. WALSH:  Yeah, I will, and I'll tell you right

17  now, very simple.  Reifler testified that he had problems with

18  Cohen going back to 2001 when they had EURAM.  They were both

19  investors.  Reifler threw in $300,000 for two percent interest.

20  Cohen was a big investor in EURAM.  It was a Viennese bank that

21  they brought as an investment vehicle.  According to Cohen --

22  according to Reifler, Cohen and he were also partners in this

23  company called Pali Capital which was a broker dealer.  Reifler

24  put in a million.  Cohen put in good will.  In 2007 there was

25  going to be what they called a reorg which is a transfer of all

1   the EURAM shares to Pali Holdings, and my point is this that

2   when Reifler testified, he said he had problems going back to

3   2005 as to where some of these shares and Capital Holdings

4   popped up from.  And that's the reason he was calling Cohen a

5   crook and a money launderer, and he said, I had concerns about

6   this.  I was asking Freedman (phonetic), our lawyer, and he

7   never gave me real answers.

8           Now, then there was the question of the Fifth

9   Amendment that Reifler took in the December 18th deposition in

10   2008.  There was a proxy agreement which he on two separate

11   occasions during his testimony represented that he was given

12   and the voting rights for those shares represented in a proxy

13   statement were sent to him by a fellow named John Staddon who

14   was a shareholder in EURAM and subsequently in Capital

15   Holdings.  And he was very vociferous in his deposition, very,

16   very colorful as he was with me, that he had this and he voted

17   it.

18           So then -- that's September, October.  December 18th,

19   2008, he's examined.  He repeatedly take the Fifth Amendment as

20   to whether or not he forged Staddon's signature.  That proxy

21   agreement and those negotiations about that proxy took place in

22   March and April -- March of 2007.  The application for

23   insurance was signed on June 21, 2007.

24           Staddon testified in the same underlying litigation

25   and unequivocally said, I never gave him my voting rights.  He

1  never agreed to forgive a debt that I had.  So it seems to me

2  that everyone's interested, you know, in this and if someone

3  says I took the Fifth Amendment and a document -- about a

4  document in 2007 and I'm filing an application for insurance

5  and I know of no facts or circumstances which would even bring

6  a claim.

7         The second thing is he also testified at his

8  deposition that he had concerns about Cohen and others, and

9  there was considerable interest in outside investment bankers

10 and banks to buy, this is just about the time of the reorg,

11 Capital -- Pali Capital.  He then at some point commissioned

12 Kroll (phonetic) & Associates to do an investigation.  Now, the

13 time line is not clear because we haven't seen the Kroll report

14 or the correspondence leading up to it, but my suggestion is

15 that those are information material to any underwriter.

16        Now, I'm going to get to the $60,000 question.  Mr.

17 Smith only sought witnesses who had material -- materially

18 participated in the making of the decision to deny the claim.

19 I've been involved over 30 years in coverage litigation and

20 usually I represent brokers, they never examine the claims

21 people because it's after the fact.  These people aren't

22 lawyers over there.  Their internal notes between the two of

23 them are meaningless.  They hire lawyers, they do the

24 investigation, and on these very sophisticated legal issues

25 they have to.  That's what Jamie Fleming said at his

1   deposition, I'd ask -- I'd go to the lawyer.

2           Well, he also was asked a question about, well, what

3   if you had a question about the underwriting, the wording?  I'd

4   go to the underwriter.  In my 30 years -- 35 years of doing

5   insurance work, I represent brokers mostly, they never -- the

6   claims people are throw-ins.  What they want is the broker's

7   file.  These wordings are negotiated.  They call them bespoke.

8   A lot of them are negotiated, but the broker has the file on it

9   and then they depose the underwriter because this is not a

10  legal issue.  This is long before there's any legal issues

11  involved.  There's no litigation in sight.  They're the ones

12  that do the wordings and they are -- I -- my experience is that

13  they're entitled to ask, not legal questions as such,

14  aggressive legal -- but they're entitled to ask what the intent

15  of the wordings is.  So I think he missed the ball here.  I

16  didn't hide the ball, but I think he missed the ball.

17          So -- and I also got the distinct impression this

18  race out to Chicago to put these two lawyers through the

19  tortures of the dam threatening sanctions against them.  He

20  subpoenaed Lloyd's America over on Fifth Avenue.  They're a

21  service company.  That shook up Lloyds.  He then deposed

22  Lloyd's itself.  I mean, you know, so --

23          THE COURT:  You mean the Society of Lloyd's?

24          MR. WALSH:  Yes, and they had -- they put witnesses

25  up there for them.  So it just seemed to me that time was

1  running away.  You know, you manage your litigation.  The

2  discovery deadline had been adjourned per your order to the

3  27th of August.  Time was running out, and I think that the --

4  with the greatest of respect I think he may have seen this

5  slipping by and that's when he wrote on Wasitowski's deposition

6  -- and poor Ms. Blume (phonetic) had to call and, you know, you

7  were on vacation and, you know, he wanted the discovery

8  continued and that's, I think -- I mean that was my visceral

9  reaction from being a litigator for a lot of years that, hey,

10  you know, he wants more time.

11          But I just think that, you know, to put these people,

12  to put the Society of Lloyd's, I mean they know nothing about

13  this, he wanted to know whether they have policy wording.  I

14  mean it just went on and on.  It was terrible.  I didn't -- I

15  wasn't involved it, but, you know, it shook them up because

16  they have a reputation here.

17          THE COURT:  All right.  Mr. Walsh --

18          MR. WALSH:  Okay.

19          THE COURT:  -- you've been a lot of stuff --

20          MR. WALSH:  Okay.

21          THE COURT:  -- most of which is on the merits.

22  You've made a number of factual assertions vis-a-vis the things

23  that you would say by reason to support your contention that

24  the Lloyd syndicate was defrauded into continuing coverage.

25  Have you given Mr. Smith all of the documents that provide the

1  predicate for what you said to me for the last 10 minutes or

2  not?

3          MR. WALSH:  Yes.  Also by the way --

4          THE COURT:  And to the extent that the investigating

5  lawyer --

6          MR. WALSH:  Hanson.

7          THE COURT:  I'm sorry?

8          MR. WALSH:  Hanson.

9          THE COURT:  Hanson, right, described any of the facts

10 that he looked at in his investigation in contrast to his legal

11 views, have you produced that portion of those documents?

12         MR. WALSH:  I tell you I produced -- no, not the

13 reports themselves.  I mean -- he's got all the files that we

14 had and what Hanson had and what Tordie had, you know, but I

15 didn't produce -- they're kind of intertwined.

16         THE COURT:  I know they're intertwined and although I

17 hate doing it, I do it when I have to which is I need to review

18 the documents --

19         MR. WALSH:  I'd be happy to give them to you.

20         THE COURT:  -- and -- in camera and address the

21 portions that are protected by privilege and those that aren't.

22 Coincidentally I had to do it in a very case that starts in 15

23 minutes.

24         MR. WALSH:  No, we're happy to do it.

25         THE COURT:  All right.  So we'll work out a time for

32

1   that.

2           MR. WALSH:  Can I say one more thing before we close?

3   The witness that we proposed bringing on will be an underwriter

4   because the underwriter is the one that's interested in the

5   information, not the claims people, and that's it.  I mean I'm

6   not going to -- I don't intend to bring Fleming.  I don't

7   intend to bring Roberts.  I don't intend to bring Hanson or

8   have an affidavit by Hanson.  I don't need any of them.  You

9   know, if an underwriter says -- and I can bring in any

10  underwriter who writes financial institutions and say would you

11  deem this to be material underwriting information that should

12  be disclosed to you?  And if he says, yes, that's it.  You

13  know, I don't even have to -- I just show him the testimony in

14  the record, nothing else, no hidden facts.

15          THE COURT:  All right.

16          MR. WALSH:  Now, one more thing, Your Honor, before I

17  finally close.  I mentioned -- and maybe this will help solve

18  things, I mentioned earlier today in a meeting with the

19  trustee's counsel about the possibility of a mediation and I

20  thought that maybe -- because it seems to me that this is

21  vituperative going back and forth with the discovery is maybe

22  never ending and I thought a mediation with the trustee's

23  counsel there with the mediator, along with Mr. Smith, may

24  result in a settlement and may result in a resolution

25  hopefully, but certainly that would be --

1          THE COURT:  By a settlement you mean of the

2  underlying controversy?

3          MR. WALSH:  Yeah, it would -- yeah.  So I mean she's

4  said she would go back to the trustee and take that

5  recommendation with her.  I mean I threw it up as a vehicle to

6  resolve this.

7          THE COURT:  All right.  All right.  Here's what we're

8  going to do, folks.  First of all on the idea of a mediation I

9  welcome it.  This case has been way to confrontational for way

10  too long and so you're going to work to try to make that happen

11  or explain to me why it can't.

12          MR. WALSH:  Yeah.

13          THE COURT:  On the underlying issues this is what

14  we're going to do, as a general proposition I agree with Mr.

15  Smith that if a person, even if a lawyer, does investigating

16  the merits of a claim, the legal advice he provides by reason

17  of his investigation is privileged.  His attorney mental

18  impressions are effectively privileged.  We don't use the

19  privilege word, but are fully protected, both the facts that he

20  discovers as part of it's investigation or that he considers

21  significant or not privileged.  They're merely a work product,

22  and upon a showing of need which we now have here because

23  Roberts is difficult to examine, they're going to be produced.

24          So you're going to give me, Mr. Walsh, the reports

25  and I will authorize you to redact the portions that are in the

1  first two categories and tell you what portions are in the

2  third category that need to be shared with your opponent.

3        I am sustaining the objection that you raised, Mr.

4  Walsh, to the need to educate people who don't know anything

5  about the case to then be deposed as 30(b)(6) witnesses.  I

6  don't slice and dice the extent of knowledge that a prospective

7  30(b)(6) witness has to have, if he or she has any, but if the

8  witness would -- is wholly ignorant of the matter I reject the

9  notion that you then have to educate a witness so that he or

10  she can testify about something that the witness otherwise

11  doesn't have anything -- know anything about.  You may have to

12  face the consequences of not having a witness who can't prove

13  your allegations, but that isn't the same thing.

14        Nobody gets to testify before me unless he or she

15  gets deposed.  So -- and you're going to think long and hard

16  how you're going to prove the facts upon which you're going to

17  raise your affirmative defenses, but if you're going to do with

18  a human being, that human being is going to be deposed.  And

19  for the avoidance of doubt I don't think you quarreled with the

20  notion that if your opponent wants to examine Roberts your

21  opponent has that right and he does, and that's whether or not

22  Roberts testifies.

23        Now, work it out with Mr. Smith the timing under

24  which you're going to get me the documents and I'll review them

25  and get to rule on them as soon as my circumstances permit.  I

1   have many, many things on my plate.  In the meantime deadlines

2   for completing discovery are tolled.  Okay.

3           MR. WALSH:  Your Honor, just -- you want the entire

4   document and then you'll --

5           THE COURT:  Whatever you haven't already given to Mr.

6   Smith --

7           MR. WALSH:  I'll send you the entirety.

8           THE COURT:  -- that Mr. Smith asked for.

9           MR. WALSH:  There's 11.

10          THE COURT:  All right.

11          MR. WALSH:  Thank you.

12          MR. SMITH:  Your Honor, may I do some cleanup?

13          THE COURT:  If it's merely cleanup and not rearguing

14  --

15          MR. SMITH:  It is.  I'm --

16          THE COURT:  -- matters I've already addressed.

17          MR. SMITH:  I'm not going to address any of the

18  merits.  As it stands right now we're supposed to have pretrial

19  briefs to Your Honor on October 18th, whether we -- with a

20  trial --

21          THE COURT:  If any of --

22          MR. SMITH:  -- on or after November 1st.

23          THE COURT:  -- this stuff is relevant to what you'd

24  putting in your pretrial brief that's going to have to be

25  tolled.

1          MR. SMITH:  Is it tolled as of now or do we wait

2     until Your Honor does an in camera review or --

3          THE COURT:  Well, your duty to keep working on them

4     stops for the time being and you duty to submit them stops and

5     it'll be recalibrated based on when you have the rulings from

6     me and when you get production of anything that I conclude

7     should have been produced earlier, but hasn't been.

8          MR. SMITH:  Okay.  When you say discovery deadlines

9     are tolled I assume at this point no one is to be noticing any

10     depositions either or --

11          THE COURT:  No, discovery cutoffs are tolled.

12          MR. SMITH:  Right, that's what I meant.

13          THE COURT:  No, you guys can keep deposing.  You can

14     keep working on discovery as is otherwise appropriate.

15          MR. SMITH:  Okay.  And one final administrative

16     question.  With pretrial briefs is that when we would submit

17     motions in limine as well or do you prefer those on first day

18     of trial?

19          THE COURT:  I don't want them the first day of trial.

20     I want them in advance of that.  I normally read and rule on

21     motions in limine before trial and rule on them either before

22     trial or at the outset of a trial.  I want them early enough so

23     that I don't have a gun to my head in doing that.  I usually

24     want them a week or two before the trial.

25          MR. SMITH:  Okay.  Thank you.

1                 THE COURT:  Okay.

2                 MR. WALSH:  Your Honor, one more --

3                 THE COURT:  Yes, Mr. Walsh?

4                 MR. WALSH:  I can get them to you within two weeks so

5       that's not a problem, the 11 letters.  When you say discovery

6       is continuing I mean does that --

7                 THE COURT:  I don't -- I got the impression that Mr.

8       Smith wants to depose Mr. Roberts.

9                 MR. WALSH:  Oh, all right.

10                MR. SMITH:  I do not, Your Honor.

11                THE COURT:  I'm sorry?

12                MR. SMITH:  I do not.  The person I want to depose is

13      at this point if I'm limited to --

14                THE COURT:  Hanson.

15                MR. SMITH:  Hanson, correct.

16                MR. WALSH:  Well, Hanson --

17                THE COURT:  All right.  Well, I mean you have the

18      right to depose Hanson now, but you might to want to wait and

19      see what of Hanson's documents I'm allowing --

20                MR. SMITH:  I will do that.

21                THE COURT:  -- to be disclosed.

22                MR. WALSH:  Okay.  Thank you.

23                THE COURT:  All right.  Okay.  We're adjourned.

24      Those who are here on GM tell your colleagues that --

25                MR. WALSH:  Oh, one more thing, Your Honor.  I hate

1  to -- the Kroll report, could we have -- can you give us an

2  order on that?

3          THE COURT:  You made a relevance objection on the

4  Kroll report, Mr. Smith?

5          MR. SMITH:  Well, I made a relevance objection.  The

6  trustee has a privilege objection.

7          THE COURT:  Has a what?

8          MR. SMITH:  A privilege objection, attorney/client

9  privilege.

10         THE COURT:  I thought Kroll is -- it's Kroll

11  Associates, right?  Aren't they --

12         MR. WALSH:  No, it's Kroll Associates.  It was

13  retained by Reifler himself.

14         MR. SMITH:  No, it was not.

15         MS. ZAVALKOFF-BABEJ:  Actually, Your Honor, the

16  trustee was asserting a work product privilege as Kroll was

17  retained by Kramer Levin who was counsel to Pali at that time

18  in addition to asserting --

19         THE COURT:  I think it's unlikely that I'll find it

20  to be privileged or even work product, but why don't you give

21  me a copy of it so I can see it and I'll rule on it the same

22  time as whatever I get from Mr. Walsh.

23         MR. WALSH:  Thank you, Your Honor.

24         MR. SMITH:  Your Honor, may I address the relevance

25  issue?

1          THE COURT:  I don't see a relevance issue.  I see it

2     as relevant and I assume you contend that it's relevant.

3          MR. SMITH:  I do not contend it's relevant.  Kroll

4     wasn't even retained to do this report until July 2008, more

5     than a year after the application for insurance was submitted.

6     I don't see how in the world that's relevant.  If --

7          THE COURT:  Oh, forgive me, it's Mr. Walsh who wants

8     it.

9          MR. SMITH:  Correct.

10         MR. WALSH:  Sure, it's relevant as I just said.  I

11    think the Court ought to read it because I think it goes back

12    to -- and I'm not so sure -- Reifler testified that, you know,

13    he had concerns going back.  I'd like to know the breadth of

14    the Kroll undertaking.  If that was involving facts and

15    circumstances that Reifler was concerned about between the

16    transfer of shares from EURAM to Pali it's very relevant.

17         THE COURT:  I remember why I thought it was relevant.

18    I thought the Kroll report would be hearsay.  It would not be

19    admissible itself, but to the extent there were facts that

20    Kroll discovered that might have also be known by Mr. Reifler I

21    thought that they might lead to discoverable evidence.

22         MR. WALSH:  Thank you.

23         THE COURT:  But I will not make a final judgment on

24    that until you give the report so I can see whether my

25    instincts are sound or not.

1          MR. SMITH:  Well, Your Honor, I will let the trustee

2   do that because they're the holder of the privilege.  I will

3   say that it was commissioned by Kramer Levin, Pali's counsel,

4   in the middle of litigation.  So to me that seems like --

5          THE COURT:  Yes, that's why there's a work product

6   argument.

7          MR. SMITH:  I thought Your Honor said there was no

8   work product --

9          THE COURT:  No, I said that there is a work product

10  argument which can be blown upon a -- or which can provide a

11  basis for discovery anyway if there is a suitable showing of

12  need.

13         MR. WALSH:  Thank you, Your Honor.

14         THE COURT:  Right.

15         MR. WALSH:  That's what I thought you said.

16         THE COURT:  Right.  All right.  We're adjourned.

17                      *  *  *  *  *

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

I, COLETTE MEHESKI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


*Colette Meheski*
_____

COLETTE MEHESKI

J&J COURT TRANSCRIBERS, INC.   DATE:   October 18, 2012